1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11    MARTA MOHORKO,                          Case No. 2:16-CV-04933-GJS

12                    Plaintiff

13          v.                                **MEMORANDUM OPINION AND
                                              ORDER**
14    NANCY A. BERRYHILL,[1] Acting
      Commissioner of Social Security,
15
                      Defendant.
16

17                      **I.    PROCEDURAL HISTORY**

18          Plaintiff Marta Mohorko ("Plaintiff") filed a complaint seeking review of the

19    decision of the Commissioner of Social Security ("Commissioner") denying her

20    application for Disability Insurance Benefits ("DIB").  The parties filed consents to

21    proceed before the undersigned United States Magistrate Judge [Dkt. 22, 24] and a

22    Joint Stipulation detailing each party's arguments [Dkt. 20 ("Joint Stip.")].  The

23    Court has taken the parties' arguments under submission without oral argument.

24    For the reasons discussed below, the decision of the Commissioner is affirmed.

25    ///

26

27    [1]      Nancy A. Berryhill became the Acting Commissioner of the Social Security

28    Administration on January 23, 2017, and is hereby substituted as the defendant in
      this action pursuant to Federal Rule of Civil Procedure 25(d).

## II.    ADMINISTRATIVE DECISION UNDER REVIEW

On January 17, 2012, Plaintiff filed an application for DIB, alleging disability as of June 25, 2010.  [Dkt. 15, Administrative Record ("AR") 170-76.]  Plaintiff's claim was denied at the initial level of review and on reconsideration.  [AR 101-05, 107-11.]  On February 14, 2014, Administrative Law Judge ("ALJ") Marti Kirby held a hearing.  [AR 51-74.]  On May 6, 2014, the ALJ issued a decision denying Plaintiff's request for benefits.  [AR 30-43.]

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff was not disabled.  *See* 20 C.F.R. § 404.1520(b)-(g)(1).  At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  [AR 32.]  At step two, the ALJ found that Plaintiff suffered from the severe impairments of pseudotumor cerebri (idiopathic intracranial hypertension) with alleged residual short-term memory loss and headache, and status-post shunt placement surgery in January 2010.  [*Id.*]  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in Appendix I of the Regulations, ("the Listings").  [AR 36]; *see* 20 C.F.R. Part 404, Subpart P, Appendix 1.  Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels, with the following nonexertional limitations:

> [Plaintiff] can frequently perform postural activities; she cannot climb ladders, ropes or scaffolds; she cannot work at unprotected heights, around moving machinery, or other hazards; she cannot perform jobs requiring [hypervigilance] or intense concentration on a particular task (meaning she is precluded from performing jobs where she could not be off task for even the shortest amount of time such as watching a surveillance monitor or where safety might be an issue); she cannot do jobs that require fast-paced, production, or assembly-line type work; she can have occasional non-intense interaction with

the general public; she is limited to unskilled work; and she will likely be off task up to 10% of the workday or work week (which is about 48 minutes a day or 4 hours a week).

[AR 36.]  Applying this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work, but determined that based on her age (49 years old at the time of her alleged onset date), high school education, and work experience, she was capable of making a successful adjustment to other work existing in significant numbers in the national economy, including work as a dining room attendant, industrial cleaner, and laundry laborer and, thus, was not disabled.  [AR 41-43.]

The Appeals Council denied review of the ALJ's decision on May 11, 2016, 2015.  [AR 1-4.]  Plaintiff initiated this action on July 6, 2016.  [Dkt. 1.]

## III.    GOVERNING STANDARD

Under 42 U.S.C. § 405(g), the Court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and (2) the Commissioner used correct legal standards.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotations omitted); *see also Hoopai*, 499 F.3d at 1074.

## IV.    DISCUSSION

### A.  Plaintiff's Mental Impairment

#### 1.  Plaintiff's Depression and Anxiety Were Not Severe Impairments

Plaintiff contends that the ALJ erred at step two of the sequential evaluation process by failing to properly evaluate the severity of her depression and anxiety. [Joint Stip. at 5, 14-15.]

At step two, the ALJ must determine whether the claimant "has a medically severe impairment or combination of impairments."  *Smolen v. Chater*, 80 F.3d

3

1273, 1290 (9th Cir. 1996); 20 C.F.R. § 404.1520(a)(4)(ii). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Smolen*, 80 F.3d at 1290 (citations omitted). An ALJ's decision, however, will not be reversed for incorrectly finding an impairment non-severe if the error was harmless. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless." (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990))).

In determining whether a claimant has a medically severe mental impairment, an ALJ is required to follow a special psychiatric review technique. 20 C.F.R. § 404.1520a.[2] The ALJ must determine whether an applicant has a medically determinable mental impairment, rate the degree of functional limitation for four functional areas, determine the severity of the mental impairment, and then, if the impairment is severe, proceed to step three of the disability analysis. 20 C.F.R. § 404.1520a; *see Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011). The regulations specify four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). A mental impairment is generally considered not severe if the degree of limitation in the first three functional areas is rated as "none" or "mild" and there have been no episodes of decompensation. 20 C.F.R. § 404.1520a(d)(1).

On May 15, 2012, Plaintiff was evaluated by psychologist Banafshe P.

---

[2]     The Social Security Administration issued revised rules for evaluating mental disorders effective January 17, 2017. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sep. 26, 2016). The Court applies the regulations that were in effect at the time the Commissioner's decision became final. *See id.* at 66178, n. 1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions); *see also Wood v. Berryhill*, No. 14-36064, 2017 WL 2672671, at *2, n. 1 (9th Cir. June 21, 2017).

Sharokhi, Ph.D. [AR 441-48.] Plaintiff complained of short-term memory deficits, depression, anxiety and related problems. [AR 442.] Dr. Sharokhi found Plaintiff to be an "unreliable historian," as she appeared to be "highly embellishing cognitive symptomatology." [AR 442, 447.] While intelligence testing indicated that Plaintiff had a full scale IQ of 67, Dr. Sharokhi noted problems with the validity of the test results. [AR 446-47.] She explained that Plaintiff's "cognitive abilities appear higher than shown on psychometric testing" and her "extremely inconsistent effort, low motivation, carelessness, and impulsivity affected testing results." [AR 446.] Dr. Sharokhi cautioned that Plaintiff's "test results should be interpreted with these caveats in mind." [AR 446.] Dr. Sharokhi further noted that Plaintiff's evaluation as well as her medical records revealed no significant memory deficits or cognitive disorders and that a diagnosis of mild mental retardation was not probable. [AR 442, 447.] As for Plaintiff's complaints of depression and anxiety, Dr. Sharokhi noted that Plaintiff was not taking any psychiatric medications and had never received psychiatric treatment, counseling or hospitalization for a psychiatric condition. [AR 442.] Dr. Sharokhi concluded that Plaintiff met the diagnostic criteria for depressive disorder, not otherwise specified, appeared to be functioning intellectually in the borderline to low average intellectual range, and presented with overall mild limitations. [AR 444, 447-48.] Dr. Sharokhi assessed Plaintiff with a global assessment of functioning ("GAF") score of 60 and "mild" limitations in the ability to understand, remember and carry out detailed instructions, maintain attention and concentration, and maintain persistence and pace. [AR 447-48.] Dr. Sharokhi found that Plaintiff had no limitations understanding, remembering and carrying out short, simple instructions, accepting instructions from supervisors, performing simple work-related tasks without additional supervision, maintaining day-to-day activities, including attendance and safety, and interacting appropriately with supervisors, coworkers, and peers. [AR 448.]

On June 6, 2012, a State agency medical consultant, Dr. Michael Keer, noted

that Plaintiff had a history of complaining of memory problems and depressed mood, but concluded that her mental impairment (affective disorders) was not severe. [AR 80-81.] Dr. Keer opined that Plaintiff's reported full scale IQ score of 67 was "not valid," as the consultative psychological examiner (Dr. Sharokhi) found that Plaintiff had not put forth full effort in testing at her psychological evaluation and appeared to be highly embellishing cognitive symptomatology. [AR 82.] On January 8, 2013, a second State agency medical consultant, Dr. H. Amado, also found Plaintiff's mental impairment was not severe. [AR 96-97.]

In the decision, the ALJ found that Plaintiff's alleged residual short-term memory loss was a severe impairment, but her "medically determinable mental impairments of depression and anxiety, considered singly and in combination, [did] not cause more than a minimal limitation in [her] ability to perform basic mental work activities and [were] therefore nonsevere." [AR 32, 34.] The ALJ gave "great weight" to the opinions of Dr. Sharokhi and the State agency mental consultants, whose opinions supported the step two determination. [AR 35.]

In assessing Plaintiff's functional limitations in the four areas known as the "paragraph B" criteria, the ALJ found Plaintiff had only "mild" limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace, and "no episodes" of decompensation of extended duration. [AR 34.] In support of these findings, the ALJ noted that Plaintiff admitted she was able to perform a variety of daily activities, such as maintaining her personal hygiene, preparing complex meals, driving, gardening, reading, and shopping. [AR 34-35, 443-44.] Plaintiff demonstrated strong social capacity, as she reported good to excellent relationships with her family and friends and engaged in activities including going to church, barbequing, going to the beach with her family, and shopping with friends. [AR 34-35, 37, 443.] Plaintiff admitted hobbies such as sewing and reading, which demonstrated only mild limitations in maintaining concentration, persistence, and pace. [AR 34-35, 37, 443, 447.] Finally, there was

6

no evidence of decompensation recorded.  [AR 34]; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00C.

Plaintiff contends the ALJ erred by failing to adequately account for evidence from Plaintiff's treating providers that "reinforced the likelihood she was suffering from depression." [Joint Stip. at 5.]  Plaintiff asserts that her treating providers reported she was suffering from depression and anxiety that was associated with her short-term memory loss and difficulty concentrating.  [Joint Stip. at 14 (citing AR 49, 806, 808, 815).]  However, a mere diagnosis does not establish a severe impairment.  *See Febach v. Colvin*, 580 F. App'x 530, 531 (9th Cir. 2014) ("Although [claimant] was diagnosed with depression, that diagnosis alone is insufficient for finding a 'severe' impairment, as required by the social security regulations." ).  Further, none of the medical records contradicted Dr. Sharokhi's or the State agency physicians' opinions that Plaintiff had no more than "mild mental limitations." [AR 35.]  There was also no evidence Plaintiff received treatment from a mental health professional and Plaintiff's October 2013 mental status examination showed Plaintiff exhibited good mood and affect, intact memory, and good judgment and insight.  [AR 34-35, 797.]  Thus, the medical record supports the ALJ's determination that Plaintiff's medically determinable impairments of depression and anxiety did not significantly affect her ability to work.  [AR 34-35]; *see* 20 C.F.R. § 404.1520(c).

Moreover, any error in assessing the severity of Plaintiff's mental impairments was harmless because the ALJ incorporated limitations associated with Plaintiff's medically determinable mental impairments in Plaintiff's RFC.  *See Burch*, 400 F.3d at 679; *Curry*, 925 F.2d at 1131.  The ALJ found that Plaintiff was limited to unskilled work, was likely to be off task up to 10 percent of the workday or workweek, and was unable to perform jobs requiring any of the following: hypervigilance or intense concentration on a particular task; fast-paced, production or assembly-line type work; and work involving more than occasional non-intense

interaction with the general public.  [AR 36.]  Greater functional limitations were not substantiated by the medical evidence.  Accordingly, the ALJ did not commit reversible error by finding that Plaintiff's depression and anxiety were not severe impairments.

### 2.  Additional Consultative Examination Not Required

Plaintiff asserts that a second psychological consultative examination should be ordered because Dr. Sharokhi did not definitively state whether Plaintiff had been malingering or that Plaintiff's intelligence test results were invalid.  [Joint Stip. at 5-6, 15.]  The Court disagrees.

The ALJ has an independent duty to develop the record, even when the claimant is represented by counsel.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing *Smolen*, 80 F.3d at 1288).  However, it is the claimant's duty to prove that she is disabled.  *Mayes v. Massanari*, 276 F.3d 453, 458 (9th Cir. 2001); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").  An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  *Mayes*, 276 F.3d at 459-60 (citing *Tonapetyan*, 242 F.3d at 1150).

Here, the ALJ's duty was not triggered because the record was not ambiguous or inadequate.  As discussed, Dr. Sharokhi found that Plaintiff was an unreliable historian and her test results had been impacted by her extremely inconsistent effort, low motivation, carelessness, and impulsivity.  [AR 442, 446-47.]  Dr. Sharokhi also found that Plaintiff appeared to be "highly embellishing" her cognitive symptomatology, given her presentation at the evaluation, admitted level of functioning, and lack of mental health treatment.  [AR 442, 447.]  Thus, any inconsistencies in Plaintiff's test results were caused by Plaintiff's own failure to comply with the consultative examination.  While Dr. Sharokhi did not expressly

state that Plaintiff was malingering or find her test results invalid, there was no actual ambiguity of the kind that would require further development of the record. Indeed, the State agency medical consultant who reviewed Plaintiff's case on reconsideration stated that an updated psychological examination was not warranted. [AR 97.] Thus, the ALJ had no obligation to further develop the record.

### 3. Listings 12.02 and 12.05C

Plaintiff argues that the ALJ erred by failing to address Listing 12.02 for organic mental disorders and Listing 12.05C for intellectual disability. [Joint Stip. at 15.] Plaintiff asserts that these listings "potentially applied," in light of her full scale IQ score of 67 and other impairments. [Joint Stip. at 5-6, 15.] Plaintiff, however, submitted a pre-hearing brief to the ALJ acknowledging that she did not meet or equal a listed impairment. [AR 168.] Further, Plaintiff has failed to present any valid theory as to how her impairments met or equaled Listing 12.02 or Listing 12.05C.[3]

To meet Listing 12.02, a claimant must have an organic mental disorder that satisfies the requirements of paragraphs A and B or paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02. Paragraph A requires that a claimant show "a loss of specific cognitive abilities or affective changes" and paragraph B requires a showing of at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concsentration, persistent or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* Alternatively, a claimant may meet Listing 12.02 by satisfying the paragraph C criteria and demonstrating a medically documented history of a mental disorder (at least two years in duration) that has

---

[3] Revised versions of the Listing 12.02 and Listing 12.05 went into effect on January 17, 2017. *See* 81 Fed. Reg. at 66,139-40, 66148-49. The Court applies the listings that were in effect at the time the Commissioner's decision became final. *See* 81 Fed. Reg. at 66,178, n. 1; *see also Wood*, 2017 WL 2672671, at *2, n. 1.

more than minimally limited the claimant's ability to do basic work activities and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that results in decompensation with even a minimal increase in mental demands or change in the environment; or (3) current history of at least one year of inability to function outside a highly supportive living arrangement. *Id.*

Here, Plaintiff has offered no theory, plausible or otherwise, as to how her impairments meet or equal Listing 12.02. While Plaintiff asserts that she has a full scale IQ score of 67, was status-post pseudotumor cerebri with shunt placement and revision in 2010*,* and has short-term memory and concentration problems, she fails to point to any medical evidence establishing that her impairments, either alone or in combination, meet or equal, the criteria in paragraphs B or C of Listing 12.02. [*See* AR 34-35.] Therefore, the ALJ did not err by failing to find that Plaintiff's impairments satisfied Listing 12.02.

Likewise, Plaintiff has not shown that her impairments met or equaled the requirements of Listing 12.05C. The introductory paragraph to Listing 12.05 requires a claimant to show deficits in adaptive functioning before the age of 22. 20 C.F.R. § 404, subpt. P, app. 1, § 12.05. This requirement is in addition to those relating to intellectual functioning. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00 (stating that in order for a claimant to meet Listing 12.05, she must "satisf[y] the diagnostic description in the introductory paragraph and any one of the four sets of criteria"). Although Plaintiff may have a qualifying full scale IQ score, she does not satisfy the introductory paragraph with evidence of deficits in adaptive functioning before the age of 22. Rather, Plaintiff alleges onset of memory and cognitive difficulties beginning in 2010 when she was 49 years old. [AR 42, 55, 170, 201.] Plaintiff also acknowledges that she is a high school graduate, was not in special education classes, maintained regular employment, and "may have had a higher IQ at some point." [Joint Stip. at 6; AR 54-55, 192.] Thus, the ALJ did not err by

failing to find that Plaintiff's impairments satisfied the requirements of Listing 12.05C.

## B. Plaintiff's Subjective Symptom Testimony and Third-Party Statements

### 1. Plaintiff's Credibility

Plaintiff contends that the ALJ failed to state sufficient reasons for discounting her credibility. [Joint. Stip. at 16-17.]

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and there is no affirmative evidence of malingering, the ALJ must offer "clear and convincing" reasons to reject the claimant's testimony. *Smolen*, 80 F.3d at 1281-82; *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'") (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). Moreover, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284; *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must "specifically identify the testimony [the ALJ] finds not to be credible and must explain what evidence undermines the testimony"); *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991). In addition to the "ordinary techniques of credibility evaluation," *Bunnell*, 947 F.2d at 346, the following factors may be considered in assessing credibility: (1) the claimant's reputation for truthfulness; (2) inconsistencies in the claimant's testimony or between his testimony and conduct; (3) claimant's daily living activities; (4) claimant's work record; and (5) testimony from physicians or third parties concerning the nature, severity, and effect of claimant's condition. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

At the administrative hearing, Plaintiff testified that she suffers symptoms

relating to her pseudotumor cerebri and shunt treatment, such as headaches, short-term memory loss, and difficulty focusing. [AR 55-57, 62.] Plaintiff also claimed that she experiences depression, anxiety, and vision problems. [AR 201, 226, 240.]

The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause some of Plaintiff's alleged symptoms, Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent alleged. [AR 39.] The ALJ offered legally sufficient reasons to support this adverse credibility determination.

First, the ALJ found that Plaintiff received treatment that was "routine and conservative in nature, primarily in the form of medications." [AR 38, 41.] An ALJ may properly rely on the fact that only routine or conservative treatment has been prescribed. *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (finding that plaintiff's claim that she experienced pain "approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received"). The ALJ noted that the medical evidence showed good improvement in Plaintiff's symptoms of headaches and blurry vision with minimal treatment after Plaintiff underwent successful shunt surgery with revision in 2010 to treat her pseudotumor cerebri. [AR 41.] In February 2010, Plaintiff's physician reported that she was doing "remarkably well" and her papilledema (swelling of optic nerve caused by increased pressure in or around the brain) was "completely gone." [AR 40, 554.] In September 2010, Plaintiff's shunt was adjusted due to complaints of headaches. [AR 40, 550.] In March 2011, Plaintiff reported that she had not been suffering from headaches or pressure sensations related to her pseudotumor cerebri. [AR 40, 308.] In November 2011 and February 2012, Plaintiff was treated conservatively with medications for complaints such as dizziness, headaches, and nausea. [AR 40, 422, 423-24, 427, 439-40, 695-97.] In May 2012, findings from a consultative neurological evaluation were unremarkable and Plaintiff's vision with glasses was 20/30 in both eyes. [AR

12

40, 451-52.]  In June 2012, Plaintiff admitted that her headaches were not a concern for her.  [AR 40, 500.]  In September 2013, Plaintiff was treated with pain medication for complaints of headaches.  [AR 791, 793.]  By November 2013, Plaintiff reported feeling well with no additional headaches.  [AR 41, 798.]  Further, as discussed above, the ALJ found that although Plaintiff complained of anxiety and depression, the record contains no evidence of treatment from a mental health professional.  [AR 35.]  While Plaintiff alleges she experienced a lapse in health insurance, Plaintiff admits that she was able to obtain medical services through the county.  [Joint Stip. at 17, 27; AR 63.]  Accordingly, Plaintiff's relatively routine and conservative treatment was a specific, clear and convincing reason to discount Plaintiff's credibility.

Second, the ALJ found that evidence "indicat[es] that [Plaintiff] may be attempting to portray limitations that are not actually present in order to increase her chance of obtaining benefits."  [AR 38.]  The ALJ discussed Dr. Sharokhi's findings that Plaintiff's "cognitive abilities appeared higher than shown on psychometric testing."  [AR 38, 446.]  The ALJ also noted that although Plaintiff alleged cognitive difficulties, Plaintiff's "mental status examinations and neurological evaluations did not indicate any serious limitations" and Plaintiff "failed to mention cognitive issues to her treating doctor on several occasions."  [AR 38, 40-41, 444-45, 449-53, 501.]  Plaintiff argues that the ALJ did not actually find that Plaintiff was malingering or intentionally exaggerating.  [Joint Stip. at 17.]  Plaintiff also notes that Dr. Sharokhi did not have access to all of Plaintiff's medical records.  [Joint Stip. at 26.]  Nevertheless, the ALJ reasonably inferred from the medical evidence that Plaintiff may have exaggerated her symptoms and limitations.  [AR 38 ("There is some reference in the record, i.e., statements by [Dr. Sharokhi] suggesting that [Plaintiff] was engaging in possible malingering or misrepresentation."); *see also* AR 34, 442, 446-47.]  This was a specific, clear, and convincing reason for discounting Plaintiff's subjective complaints.  *Tonapetyan*, 242 F.3d at 1148 (ALJ properly

13

found that the claimant's "tendency to exaggerate" was a factor supporting the determination that she was not credible).

Third, the ALJ properly observed that Plaintiff's ability to participate in a variety of daily activities "diminishes the credibility of [Plaintiff's] allegations of functional limitations." [AR 38]; *see Bunnell*, 947 F.2d at 346 (An ALJ may consider a claimant's daily activities when weighing credibility); *Burch*, 400 F.3d at 680 (upholding ALJ's rejection of a claimant's credibility based on the claimant's daily activities of cooking, cleaning, shopping, interacting with others and managing her own finances and those of her nephew); *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("[e]ven where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting [the claimant's] testimony to the extent that they contradict claims of a totally debilitating impairment."). Plaintiff claimed she is unable to perform even unskilled work that does not involve stress or interaction with the public due to problems focusing and concentrating. [AR 62.] She also alleged difficulty completing tasks and understanding instructions. [AR 225.] The ALJ reasonably found Plaintiff's reports of extreme limitations in functioning not credible in light of Plaintiff's admissions that she could complete basic household chores, grocery shop, sew, drive, prepare complex meals, pay bills, read, wash dishes, garden, and engage in social activities including barbequing, going to the beach with her family, shopping with friends, attending church, and visiting with her daughter. [AR 34-35, 37-38, 222-24, 443, 447.] Plaintiff's daughter also reported that Plaintiff retained the ability to engage in a number of activities. [AR 39, 231-33.] Such inconsistencies between Plaintiff's reported daily activities and her claimed limitations was a specific, clear and convincing reason supporting the rejection of her credibility. *See*, *e.g.*, *Burch*, 400 F.3d at 680-81; *Molina*, 674 F.3d at 1113.

Finally, the ALJ found that the record contains no restrictions recommended by a treating source indicating that Plaintiff has any limitations greater than those

14

assessed in Plaintiff's RFC. [AR 38.] Plaintiff points to nothing in the record showing otherwise. Thus, this was a specific, clear and convincing reason to discount Plaintiff's credibility. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (the ALJ properly discounted the claimant's allegations where no doctor "expressed the opinion that [the claimant] was totally disabled" or implied that he "was precluded from all work activity").

Plaintiff also asserts that the ALJ improperly relied on a lack of objective evidence, Plaintiff's receipt of unemployment benefits, and the infrequency of treatment in rejecting her subjective symptom testimony. [Joint Stip. at 17, 27.] However, because the Court has already determined that the ALJ provided specific, clear and convincing reasons for discounting Plaintiff's subjective complaints, it need not determine whether the ALJ erred in considering these other reasons for discrediting Plaintiff's testimony. *See Carmickle*, 533 F.3d at 1162-63 (finding an error by the ALJ with respect to one or more factors in a credibility determination may be harmless if the ALJ's "remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record"). Accordingly, the Court concludes that reversal is not warranted based on the ALJ's alleged failure to properly consider Plaintiff's credibility.

### 2. Third-Party Statements

Plaintiff contends that the ALJ erred by failing to address the lay witness statements of her daughter, Jade Ortiz, and her husband, Edgar Mohorko. [Joint Stip. at 18.] Remand is not warranted on this basis.

"[C]ompetent lay witness testimony 'cannot be disregarded without comment'" and "in order to discount competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness.'" *Molina*, 674 F.3d at 1114 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) and *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). However, an ALJ's failure to address a lay witness's testimony is harmless if it is "'inconsequential to the ultimate

15

nondisability determination' in the context of the record as a whole." *Molina*, 674 F.3d at 1122 (citations omitted); *see Carmickle*, 533 F.3d at 1162.

Ortiz submitted a third-party function report dated December 31, 2012, and a letter to Plaintiff's attorney dated February 13, 2014. [AR 229-37, 260.] In the function report, Ortiz described Plaintiff's daily and social activities, but noted that Plaintiff became easily stressed and frustrated, suffered from headaches, and had problems with memory, concentration, and sleep. [AR 229-36.] In her letter, Ortiz described Plaintiff's problems with her mood, memory, fatigue, and ability to perform certain activities. [AR 260.]

Edgar Mohorko also wrote a letter to Plaintiff's attorney on February 13, 2014. [AR 261.] He described Plaintiff's problems with her short-term memory after she was diagnosed with pseudotumor cerebri. [AR 261.]

In the decision, the ALJ considered the third-party function report provided by Ortiz. [AR 37, 39.] The ALJ found Ortiz's statement not credible to the extent it was inconsistent with the ALJ's findings and evidence in the record. [AR 39.] The ALJ noted, among other reasons, that Ortiz's reports of Plaintiff's cognitive issues was inconsistent with the clinical and diagnostic medical evidence. [AR 39.] This was a germane reason for discounting Ortiz's statement. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("[i]nconsistency with medical evidence" is germane reason for discounting lay opinion). The ALJ also noted that Ortiz was simply "parroting" Plaintiff's subjective complaints, which were inconsistent with Plaintiff's "ability to engage in a number of daily activities." [AR 39.] This was also a germane reason for discounting Ortiz's third-party function report. *See, e.g.*, *Valentine v. Comm'r of the Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the claimant's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony"). Thus, the ALJ's rejection of Ortiz's third-

16

party function report is supported by substantial evidence and was not error.

Although the ALJ failed to address the letters from Ortiz and Edgar Mohorko, the error was harmless.  [AR 260-61.]  As discussed above, the ALJ incorporated Plaintiff's limitations associated with her short-term memory and other medically determinable mental impairments into her RFC.  [AR 36]; *see Curry*, 925 F.2d at 1131; *Molina*, 674 F.3d at 1115.  While Ortiz also described limitations related to Plaintiff's sleep and mood in her letter, those statements were similar to her statements in her third-party function report, which the ALJ found unpersuasive in light of Plaintiff's daily activities and lack of supporting medical evidence. Accordingly, to the extent the ALJ may have failed to consider lay witness evidence, the error was "inconsequential to the ultimate nondisability determination."  *Molina*, 674 F.3d at 1115.

### C. The ALJ Properly Determined that Plaintiff was Able to Adjust to Other Work

Plaintiff contends that the ALJ erred in finding that she was capable of performing alternative work at step five of the sequential evaluation process, as her RFC precludes the jobs that the vocational expert ("VE") identified at the administrative hearing.  [Joint Stip. at 28-29, 33-35.]

At step five, the Commissioner has the burden of establishing that the claimant can perform alternative jobs that exist in substantial numbers in the national economy.  *Bruton v. Massanari*, 268 F.3d 824, 827 n.1 (9th Cir. 2001). "Where the testimony of a VE is used at step five, the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy."  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-1163 (9th Cir. 2001).  An ALJ may not rely on a VE's testimony regarding the requirements of a particular job without first inquiring whether that testimony conflicts with the Dictionary of Occupational Titles ("DOT").  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  If an apparent

conflict exists, the ALJ must obtain an explanation for it, determine whether the VE's explanation is reasonable, decide whether a basis exists for relying on the VE rather than on the DOT, and explain how he or she resolved the conflict. *Massachi*, 486 F.3d at 1152-1153; *see* Social Security Ruling 00-4p.

At the hearing, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, background, and RFC. [AR 70-72.] The VE identified three examples of unskilled jobs that could be performed: dining room attendant (DOT 311.677-018), industrial cleaner (DOT 381.687-018), and laundry laborer (DOT 361.687-018). [AR 71-72.] The ALJ then inquired whether the dining room attendant position could be performed with Plaintiff's restriction to "occasional non-intense interaction with the general public." [AR 71.] The VE responded that the dining room attendant job could be performed because it is similar to a "bus person" job. [AR 71.] In a second hypothetical question, the ALJ asked the VE to consider the additional limitation that the individual would be "off task up to 10 percent of the workday or workweek . . . about 48 minutes a day or four hours a week . . . due to psychological symptoms or side-[effects] from medication." [AR 72.] The VE responded that the same three jobs could be performed. [AR 72.] The VE affirmed that his testimony in response to the first hypothetical was consistent with the DOT, but he integrated his "knowledge and experience" into his response to the second hypothetical, as the DOT "does not specify hypervigilance or fast paced work." [AR 73.] Based on the VE's testimony, the ALJ concluded that Plaintiff retained the ability to perform jobs existing in significant numbers in the national economy. [AR 42-43.]

### 1. Dining Room Attendant (Bus Person)

The DOT describes the duties of a dining room attendant (bus person) as follows:

> Performs any combination of following duties to facilitate food service:
> Carries dirty dishes from dining room to kitchen. Wipes

18

> table tops and chairs, using damp cloth. Replaces soiled table linens and sets tables with silverware and glassware. Replenishes supply of clean linens, silverware, glassware, and dishes in dining room. Supplies service bar with food, such as soups, salads, and desserts. <u>Serves ice water and butter to patrons</u>. Cleans and polishes glass shelves and doors of service bars and equipment, such as coffee urns and cream and milk dispensers. Makes coffee and fills fruit juice dispensers. May sweep and mop floors. <u>May transfer food and dishes between floors of establishment, using dumbwaiter,</u> and be designated Dumbwaiter Operator (hotel & rest.). May run errands and deliver food orders to offices and be designated Runner (hotel & rest.). May be designated according to type of activity or area of work as Clean-Up Helper, Banquet (hotel & rest.); Counter Dish Carrier (hotel & rest.); Dish Carrier (hotel & rest.); Glass Washer And Carrier (hotel & rest.); Room Service Assistant (hotel & rest.); Steamtable Worker (hotel & rest.); Table Setter (hotel & rest.); Water Server (hotel & rest.).

DOT 311.677-018 (emphasis added).

Plaintiff contends that she cannot perform the job of dining room attendant because it requires more interaction with the public than contemplated by her RFC. [Joint Stip. at 28, 33.] Plaintiff, however, has failed to show that the job of dining room attendant requires more than occasional non-intense interaction with the public. [AR 36.] While Plaintiff notes that the DOT provides that a dining room attendant job involves "[s]erv[ing] ice water and butter to patrons," the DOT classifies the level of contact with "people," as "not significant." DOT 311.677-018. In addition, the VE expressly stated that the job involves bussing tables, which does not conflict with Plaintiff's limitation in dealing with the public. [AR 71.]

Plaintiff further contends that the job of dining room attendant is precluded because she is unable to use dangerous, moving machinery. [Joint Stip. at 28.] The DOT, however, states that the dining room attendant job does not involve the use of "moving mech[anical] parts." DOT 311.677-018. While Plaintiff notes that the

DOT indicates that the dining room attendant "[m]ay transfer food and dishes between floors of establishment, using [a] dumbwaiter," Plaintiff offers no evidence or argument that use of a dumbwaiter involves exposure to dangerous or moving machinery. But even if it did, the DOT description of the dining room attendant job does not require that an employee be able to perform all of the listed duties of the job, but rather "any combination" of them. DOT 311.677-018; *see*, *e.g.*, *Dumble v. Astrue*, No. EDCV 11-266-OP, 2011 WL 4502086, at *6 (C.D. Cal. Sept. 28, 2011) ("although the job description states that a hand packager performs 'any combination' of the tasks listed in the DOT, it does not state that a worker is required to perform all of them"). Additionally, the DOT states that a dining room attendant "may" be required to perform the tasks of transferring "food and dishes between floors of establishment, using [a] dumbwaiter." DOT 311.677-018. The permissive "may" language in the job description means that only some establishments will require that job function, but not others. DOT, Parts of the Occupational Definition, § 5(c), 1991 WL 645965; *see also Lair v. Colvin*, EDCV 12-932-SP, 2013 WL 1247708, at *5 (C.D. Cal. Mar. 25, 2013). Thus, there was no conflict between the DOT and the VE's testimony that someone with Plaintiff' limitations can perform the job of dining room attendant.

### 2. Laundry Laborer and Industrial Cleaner

Plaintiff contends that the jobs of laundry laborer and industrial cleaner are precluded because her RFC limits her ability to climb and work around moving machinery or other hazards. [Joint Stip. at 28-29, 34-35.] She contends that the industrial cleaner job may require climbing and the use of conveyor belts, industrial trucks, and pumps. [Joint Stip. at 28, 34.] Plaintiff asserts the laundry laborer job requires use of machines and equipment such as conveyor belts, power hoists, industrial trucks, elevators, winches, and handtrucks. [Joint Stip. at 28-29, 34-35.] It is unnecessary to determine whether the industrial cleaner and laundry laborer jobs require the type of climbing and use of moving machinery or hazards that is

20

precluded by Plaintiff's RFC.  As discussed above, the ALJ did not err in finding Plaintiff could perform the job of dining room attendant, and Plaintiff's ability to perform that job is sufficient to support the ALJ's step-five finding.[4]  [AR 42-43, 72.]  Thus, even if the ALJ erred in finding Plaintiff could do the jobs of industrial cleaner and laundry laborer, the error was harmless.  *See Carmickle*, 533 F.3d at 1162; *see also Gallo v. Comm'r of Soc. Sec. Admin.,* 449 F. App'x 648, 650 (9th Cir. 2011) (holding that "[b]ecause the ALJ satisfied his burden at Step 5 by relying on the VE's testimony about the [a]ddresser job, any error that the ALJ may have committed by relying on the testimony about the 'credit checker' job was harmless.").

### 3.  Plaintiff's RFC and Time Off Task

Plaintiff challenges the ALJ's RFC assessment as "contrary to the general conventions regarding unskilled work."  [Joint Stip. at 29.]  Plaintiff asserts, "[v]ery few unskilled jobs would likely permit a claimant to miss up to four hours of work per week."  [Joint Stip. at 29.]  The court rejects Plaintiff's argument that the RFC is inconsistent with the demands of unskilled work.  Contrary to Plaintiff's contention, the ALJ did not find that Plaintiff would "miss" up to four hours of work per week.  Rather, the ALJ found that Plaintiff would likely be "off task up to 10% of the workday or workweek."  [AR 36.]  Plaintiff improperly attempts to conflate the separate issues of time off task that would be permitted during a workweek and the number of hours per week that Plaintiff would miss or be absent from work.  As the VE testified that the unskilled job of dining room attendant would accommodate Plaintiff being off task up to 10 percent of the time during a workday or workweek, Plaintiff fails to demonstrate reversible error.  [AR 72-73]; *see Buckner-Larkin v. Astrue*, 450 F. App'x 626, 628-29 (9th Cir. 2011) (finding VE's testimony, which was based on his own labor market surveys, research and experience, addressed and

---

[4]  The VE testified that there were approximately 130,000 dining room attendant jobs existing nationally.  [AR 72.]

explained any conflict with the DOT regarding sit-stand option).

## CONCLUSION

For all of the foregoing reasons, IT IS ORDERED that the decision of the Commissioner finding Plaintiff not disabled is AFFIRMED.

DATED: July 10, 2017

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE